IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

ALISHA STONE,                              )
                                           )
            CLAIMANT,                      )
                                           )
v.                                         )         CIVIL ACTION NO.
                                           )         4:16-CV-772-KOB
NANCY A. BERRYHILL,                        )
ACTING COMMISSIONER OF                     )
SOCIAL SECURITY,                           )
                                           )
            RESPONDENT.                    )
                                           )
                                           )

MEMORANDUM OPINION

I. INTRODUCTION

On June 4, 2014, the claimant, Alisha Stone, protectively applied for disability insurance

benefits and supplemental security income under Titles II and XVI of the Social Security Act.

She alleged disability beginning December 3, 2012, because of Chronic Obstructive Pulmonary

Disease, asthma, rheumatoid arthritis, seizures, memory loss, manic depression, Post Traumatic

Stress Disorder (PTSD), anxiety, muscle spasms, migraines, Latent Positive TB (not active),

restless leg syndrome, fibromyalgia, problems with her left side neck vertebrae, and herniated

discs. The Commissioner denied the claimant's applications on September 14, 2014. The

claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ

held a video hearing on November 5, 2015. (R. 83-84, 19).

In a decision dated January 11, 2016, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and was, therefore, ineligible for social security benefits. On

March 10, 2016, the Appeals Council denied the claimant's request for review. Consequently,

the ALJ's decision became the final decision of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court will reverse and remand the decision of the Commissioner. (R. 16-35, 1-6).

## II. ISSUE PRESENTED[1]

Whether the ALJ's decision to give the opinion of the claimant's treating psychiatrist Dr. Grant little weight lacks substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No ... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations de novo. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

---

[1] Because it will reverse and remand the Commissioner's decision based on this issue, the court will not address the other issues the claimant raises in her brief. Moreover, given the court's reversal, it finds the claimant's motion to remand MOOT. (Doc. 15).

factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Absent a showing of good cause to the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). The ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. Where substantial evidence does not support the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, the ALJ commits reversible error. *See Perez v. Comm'r of Soc. Sec.*, 625 F. App'x 408, 417-18 (11th Cir. 2015); *see also Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was thirty-seven years old at the time of the ALJ's final decision. She had an eighth-grade education and had not completed her GED. She has past relevant work as a certified nursing assistant (CNA), a cook, and a shift manager at a fast food restaurant. She alleges disability based on COPD, asthma, rheumatoid arthritis, seizures, memory loss, manic depression, PTSD, anxiety, muscle spasms, migraines, Latent Positive TB (not active), restless leg syndrome, fibromyalgia, problems with her left side neck vertebrae, and herniated discs. (R. 221).

*Physical and Mental Impairments*

Between April 28, 2011, and November 14, 2013, the claimant sought treatment with Dr. Danny Salisbury, D.O. with Holistic Pain Management, about once every month for anxiety and constant sharp aches and pains all over her body, but typically centered in her lower back. Each visit, she reported limited activity and range of motion because of her pain and usually ranked her pain between a 3/10 and a 6/10. Activity reportedly worsened her symptoms, while medications and rest diminished her symptoms. Dr. Salisbury treated her pain with Roxicodone and Lortab, and her anxiety with Xanax, which the claimant reported were usually effective to manage her pain. (R. 381-420).

On September 28, 2012, while driving, the claimant briefly lost consciousness, possibly because of a seizure, drove off an embankment, and collided with a tree head-on. She was emergency airlifted to the Huntsville Hospital emergency room and was "in and out of responsiveness" during the transport to the hospital. Dr. Daniel Spangler indicated that the claimant was "nearly unintelligible"; that her right pupil was dilated; and that she suffered from tenderness in her head, a scalp contusion, a neck strain, chest wall contusion, and a lip laceration. Dr. Spangler also noted the claimant has a "known seizure disorder." He prescribed Dilaudid for pain, Phenergan for nausea, and Cilaucid for breakthrough pain. After her CT scans of her head and back showed no significant abnormalities, Dr. Spangler discharged the claimant the next day. He instructed her not to drive until she was cleared by another doctor because of her seizure risk and to continue taking her current pain medications. (R. 433-506).

On October 25, 2012, the claimant followed-up with Nurse Practitioner Mary Kathryn Lauderdale with Quality of Life Health Services, Inc. NP Lauderdale diagnosed the claimant with chronic seizures/convulsions, chronic low back pain, chronic fibromyalgia/myositis, chronic

anthropathy, and chronic asthma. She specifically noted under the "Neuro/Psychiatric" section that the claimant's seizures caused an "altered level of consciousness"; drooling; focal neurological deficit; memory impairment; headaches; poor insight; poor judgment; poor attention span and concentration, characterized as "concentration disjointed"; and tongue biting and unresponsiveness. Nurse Practitioner Lauderdale prescribed Fioricet, Lortab, and oxycodone for pain; Soma as a muscle relaxer; Symbicort for asthma and COPD; Tegretol for seizures; and Xanax for anxiety. (R. 601-603).

On December 14, 2012, the claimant sought treatment with CED Mental Health Center. Licensed Professional Counselor Brooke Bowen initially examined the claimant during intake. The claimant complained of depression (no appetite, no energy, lack of sleep, crying spells), anxiety, panic attacks, mood swings, and seizures. The claimant noted impairments in daily living and reported that, when she was 15 years old, her step-father raped and abused her. Ms. Bowen assessed the claimant with a 31 on the Global Assessment of Functioning (GAF) Scale, indicating major impairment in work or school, family relations, judgment, thinking, and mood. Ms. Bowen noted that the claimant had difficulty with acknowledging problems and blamed them on others or on circumstances. Ms. Bowen recommended individual therapy and a physician's medical assessment.

Dr. Richard Grant, a psychiatrist, assessed the claimant that same day and diagnosed her with major depression, severe without psychosis; post-traumatic stress disorder; seizures; and bulging/herniated discs. (R. 540-47).

On January 4, 2013, the claimant returned to CED for individual therapy with Ms. Brooks and reported an increase in her depression symptoms. The claimant's GAF Score remained at 31. Ms. Bowen worked with the claimant to establish goals to decrease depression,

learn coping strategies, and reduce her dependence on prescription medications. Ms. Bowen recommended that the claimant undergo a medical assessment by a psychiatrist every six months and have individual therapy every six weeks. Dr. Grant concurred with Ms. Bowen's recommendation. (R. 536-39).

Between December 14, 2012 and June 24, 2015, the claimant visited CED ten times for therapy and three times for consultations with Dr. Grant.[2] Several therapists with different qualifications counseled the patient during this time in addition to Ms. Bowen. During these sessions, the claimant presented mostly for major depression, PTSD, seizure disorder, panic attacks, anxiety, and diminished memory. The severity of the claimant's symptoms fluctuated during this period. By March 8, 2013, the claimant reported that her depression and seizures had worsened tremendously and that she had made no progress toward her treatment goals. The record reflects that the claimant missed several therapy appointments because "seizures messed up [her] memory." (R. 5 28-30, 534-36, 540-47, 570-78, 629-33, 639-45).

On April 19, 2013, Dr. Salisbury examined the claimant for depression and chronic pain. Dr. Salisbury noted that the claimant's mood was dysphoric and that she was tearful. Dr. Salisbury prescribed Zoloft for depression and anxiety. (R. 531-33). On July 8, 2013, Dr. Grant refilled the claimant's Zoloft prescription. (R. 530).

On November 14, 2013, Dr. Salisbury sent a letter to the claimant, informing her that as of that day, Holistic Pain Management could no longer treat her. Dr. Salisbury gave the claimant thirty days to find a new pain management doctor, during which time the claimant could rely on Holistic Pain Management for emergency care only. The letter did not specify a reason for

---

[2] According to the claimant's treatment plan to see a therapist once every six weeks, the claimant should have visited CED more than ten times during this period. The record indicates that some medical records from CED are missing; for example, a treatment plan review from June 27, 2013 notes that the claimant had a therapy session on March 8, 2013, but the record contains no notes from this visit. (R. 536).

refusing to treat the claimant further; however, the claimant later testified at the hearing that Holistic Pain Management cut her off because she allegedly abused Soma. (R. 517, 570).

The claimant missed her December 2013 therapy appointment at CED Mental Health Center. (R. 528-29).

On July 11, 2014, the claimant went to Northeast Alabama Health Services because of back, leg, and joint pain and seizures and assessed her pain at a 9/10 on the pain scale.  Nurse Practitioner Michelle Stuart, CRNP, noted that the claimant took 20 mg of Celexa daily for her depression. NP Stuart's exam revealed that the claimant's lower back was tender to palpation, but her overall musculoskeletal system findings were normal, with a normal gait and stance. Ms. Stuart prescribed Citalopram Hydrobromide for the claimant's depression; Topiramate and Topamax for seizures; Symbicort and Ventolin for COPD; Tramadol HCL, Meloxicam, Cyclobenzaprine HCL for lumbago; and Gabapentin for neuralgia/neuritis. (R. 561-66).

On July 25 and 31, 2014, NP Stuart consulted the claimant over the phone about her continued seizures and changed her prescription for the seizures to Depakene. (R. 559-60).

On August 8, 2014, the claimant returned to CED Mental Health Center for a therapy appointment. Her therapist was J. Fowler,[3] a Licensed Graduate Social Worker (LGSW).  The claimant complained of daily anxiety, depression, PTSD, panic attacks twice daily, seizure disorder, shaking hands, diminished memory, migraines, lack of energy and motivation, poor sleep, and poor appetite.  Fowler referred the claimant to Dr. Grant for an evaluation. (R. 573-78).

Dr. Grant examined the claimant on August 12, 2014.[4] He described the claimant's progress as "fair" and diagnosed her with major depression, recurrent, severe without psychosis;

---

[3] The name "J. Fowler" is a guess based on a signature.
[4] Much of this record is illegible.

PTSD; seizure disorder; restless leg syndrome; arthritis; fibromyalgia; and COPD. Dr. Grant recommended that the claimant continue her medications and counseling sessions and to follow up with him in six months. (R. 570, 578).

On August 21, 2014, Jack L. Bentley Jr., Ph.D., a Licensed Professional Counselor,[5] examined the claimant at the request of the Disability Determination Service and reviewed her prior medical record. Dr. Bentley noted the claimant's past medical history, including her seizures, and indicated that she had a diagnosis of "Bipolar Disorder"[6] from CED Mental Health Center. Dr. Bentley noted that the claimant arrived on time to the appointment, maintained good eye contact, and followed directions. Her appearance was mildly disheveled; her mood was moderately dysphoric; and she expressed considerable unhappiness with her life.

During the examination, the claimant was alert and oriented, could recite six digits forward and four backward, and could recall one-third of objects after five-minute delay. She did not know the number of weeks in a year or the author of Hamlet, but did know that the sun rises in east; could correctly interpret two proverbs; could state the analogy in 3/3 abstractions; could perform serial 7's and 3's from 100; could count backwards from 20; and could name the current and former president and current governor of Alabama.

Regarding her daily activities, the claimant reported moderate-to-severe sleep disturbance and inability to relax because of pain and anxiety. She indicated that she did not go to church, had no friends, could perform chores with frequent rests, would watch TV, but otherwise had no hobbies. Dr. Bentley noted that the claimant could complete her activities of daily living without assistance. Dr. Bentley commented that the claimant was not likely exaggerating her symptoms.

---

[5] The record contains a document from the Alabama Board of Examiners in Counseling that indicates that "Jack L. Bentley, Jr., Ph.D., is not licensed to practice psychology in the State of Alabama." (R. 585).
[6] The court can find no documentation of this diagnosis in the records from CED Mental Health Center.

He opined that the claimant was competent to manage funds. He gave the claimant a favorable prognosis for her current level of functioning. He stated that, while the claimant would have moderate or marked limitations in sustaining complex or repetitive tasks, she nonetheless could sustain simple work-related activities, and would have little limitation in her ability to effectively communicate with coworkers and supervisors. He concluded that her work-related restrictions seemed to stem from health problems rather than psychiatric difficulties. (R. 580-84).

At the request of the Disability Determination Service, Dr. Ronald Borlaza, an internist, examined the claimant on August 23, 2014. The claimant's chief complaints were chronic low back pain radiating to her right leg, aggravated by bending and alleviated by rest; asthma; COPD; chronic bronchitis, aggravated by exercise and alleviated by rest; anxiety; and depression. The claimant described her activities of daily living, stating that she could wash dishes, bathe, dress, and feed herself, but could do no yard work and had no hobbies. Her current medications were Flexeril as a muscle relaxant; Tramadol for pain relief; Gabapentin for seizures; and Celexa for her anxiety and depression.

During the claimant's physical exam, Dr. Borlaza noted that the claimant had good hygiene, could take off her shoes with mild difficulty, and walked into the exam room with mild difficulty but without assistance. She was 5'3" and weighed 186 lbs, qualifying her as obese. She passed a Romberg test for balance; could walk toe to heel; could not hop; and had a slow gait because of her low back pain. The claimant had severe lumbar tenderness with moderate lumbar pain with leg movements; range of motion limitations in her back; and a positive straight leg raising test on her right side with tingling pain in her right foot. She could grip objects securely in her palm and manipulate large and small objects.

Dr. Borlaza diagnosed the claimant with chronic low back pain with right leg weakness; asthma; COPD; chronic bronchitis; and anxiety and depression "to be evaluated by mental health." He found that the claimant had a "maximum standing capacity" of six hours; a maximum walking capacity" of six hours; no "maximum sitting capacity"; and a "maximum lifting/carrying capacity" of fifty pounds occasionally and twenty-five pounds frequently. The claimant could occasionally reach, handle, finger, stoop, and kneel; climb steps/stairs; climb ladders; crouch; and crawl. (R. 589-93).

Dr. Robert Estock, a psychiatrist, reviewed the claimant's records on September 4, 2014 at the request of the Disability Determination Service and assessed that the claimant had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and had no episodes of decompensation. (R. 94).

On October 9, 2014, the claimant attended a therapy session at CED Mental Health Center with Debby Carter, LPC. Ms. Carter worked with the claimant on her goals to decrease depression and to learn better coping skills. Ms. Carter noted that the claimant was not compliant with taking all her medications. Ms. Carter also recommended that the claimant increase therapy sessions to once monthly instead of once every six weeks and continue to see Dr. Grant every six months. (R. 634-37).

The claimant had a therapy session with Brooke Bowen at CED Mental Health Center on January 13, 2015, in which the claimant reported elevated anxiety and increased seizures, brought about by stress related to a death in the family. The claimant reported that she felt that her medications were not working and that she was having audio hallucinations. (R. 644).

On February 11, 2015, Dr. Grant at CED Mental Health Center examined the claimant and indicated that her progress was "fair." But the claimant reported that she felt nervous and anxious and that she was hearing voices calling her name. (R. 642).

On February 24, 2015, Brooke Bowen with CED Mental Health Center counseled the claimant, who reported improvement in her depression, but an increase in stress-related anxiety caused by being around a lot of people. The claimant denied hallucinations. Ms. Bowen worked on coping drills with the claimant and sleeping strategies because she was not sleeping well. (R. 641).

On May 19, 2015 and June 24, 2015, Randie Simmons, a social worker with CED Mental Health Center, counseled the claimant. Ms. Simmons noted that the claimant had been demonstrating symptoms of paranoia, in that she believed that people were plotting against her and judging her. The claimant's depression was less severe, but her mood was dysphoric. By the June visit, the claimant's mood was stable, and her depression had improved. She was suffering some anxiety about moving to a new apartment, but was also feeling better because her relationship with her mother had improved. The claimant had discovered that making to-do lists was helpful for coping with depression and anxiety. (R. 629-33, 638-39).

On September 21, 2015, Dr. David R. Wilson, a licensed psychologist, reviewed the claimant's medical records and personally examined the claimant at the request of the claimant's attorney. The claimant reported to Dr. Wilson that she had been in special education classes for English and history; dropped out of eighth grade because she was pregnant; and never obtained her GED because she could not pass the English part. (R. 726).

During the interview, the claimant reported that she "hear[s] whispers and somebody calling [her] name" and that she has panic attacks that feel like a heart attack when she is around

people. She described her daily activities as lying around and watching television; she cannot do much and "sometimes [she] just takes a nap and stares at the wall." She spends some time with her family, but does not see her friends and does not attend church. (R. at 726-27).

Dr. Wilson administered the WAIS IV test, for which he indicated the claimant gave "good effort." The test revealed that the claimant has a full scale IQ score of 65, which places her in the "Intellectually Disabled Range." Dr. Wilson also noted her score of 66 for "Working Memory."

Dr. Wilson opined that the claimant has "some serious medical problems which could make it very difficult for her to work. . . . Her ability to withstand the pressures of day-to-day occupational functioning is highly impaired." Dr. Wilson noted that the claimant had significant cognitive defects and a poor short term and working memory, making it very difficult for her to work or manage her benefits. (R. 728).

Dr. Wilson completed a mental health survey assessing that the claimant could understand simple instructions, but could not perform tasks on schedule; could not sustain an ordinary routine without supervision; could not adjust to changes in routine; could not respond appropriately to criticism from supervisors; could not interact properly with coworkers; and could be expected to miss 25 out of 30 work days a month. Dr. Wilson further noted that the claimant's medications caused her to be in a sedated state at times. (R. 724-29).

On October 29, 2015, CED Mental Health therapist Iris Davis, MS, counseled the claimant. The claimant reported increased anxiety over the prior two weeks, although her depression had decreased. (R. 743). On November 4, 2015, Dr. Grant examined the claimant and found that her depression was mostly under control, but her anxiety was worse. Dr. Grant recommended continuing with counseling. (R. 742).

On December 15, 2015, at the request of the claimant's counsel, therapist Randie Simmons and Dr. Grant filled out "Mental Health Source Statement" form regarding the claimant's ability to work . Both indicated that  the claimant could understand, remember, or carry out very short or simple instruction; could maintain socially appropriate behavior; and could adhere to basic standards of neatness and cleanliness. However, Dr. Grant and Ms. Simmons agreed that the claimaint could not maintain attention, concentration and/or pace for periods of at least two hours; could not perform activities on schedule and maintain regular attendance; could not sustain a routine without supervision; could not accept criticism from supervisors; and would miss ten to fourteen work days of work in a thirty-day period. (R. 744-45).

*The ALJ Hearing*

*The Claimant's Testimony*

The ALJ held a video conference hearing on November 5, 2015. The claimant testified that she had been unemployed since December 3, 2012. She was involved in a serious automobile accident caused by a seizure in September 2012. She stated that the airbag damaged the right side of her face and neck, leaving a permanent scar; that the seatbelt burnt her chest; and that she lost consciousness and had to be airlifted to the hospital in Huntsville. The claimant testified that since the wreck she experienced seizures once or twice monthly. She takes Neurontin to control the seizures; before she began taking Neurontin, the claimant experienced seizures at least three or four times per month.  She was not treated for the seizures until after her motor vehicle accident. (R. 45-46, 56-58).

Despite her car accident, the claimant still had her driver's license. The claimant, however, chose not to drive, because she was afraid of having another seizure behind the wheel.

The claimant stated that after her automobile accident, she only drove once during an emergency situation. (R. 64-65).

When asked about her treatment with CED Mental Health Center, the claimant stated that she began seeking treatment after her depression increased to the point that she lost interest in everything and had trouble getting out of bed. She stated that she typically saw Dr. Grant at CED about four times per year and went to therapy once monthly. The claimant stated that when she saw Dr. Grant, he would discuss medications with her and make changes if necessary. The claimant stated that she found the medications and counseling sessions to be helpful. (R. 68-69).

The claimant indicated that she took the following medications as CED prescribed: Abilify and Celexa in the mornings, Valium three times daily, and Trazadone at bedtime. Regarding side effects, the claimant stated that the Trazadone makes her feel sleepy and "drunk and wobbly," and that she feels dizzy the next morning. The Abilify and Celexa help with her depression, but she needs the Valium to combat her increased panic attacks. (R.46-48).

She experiences panic attacks at least three or four times a week, and that "the smallest thing will set [her] off." She cannot visit with more than one house guest at a time or she will have a panic attack. She does socialize some with her family, but does not socialize with any friends or neighbors and does not attend religious services. (R. 48-50, 68).

During her panic attacks, her heart races; her breathing becomes difficult; she feels light headed; and she trembles all over. After an attack, the claimant stated that she feels "completely drained; no energy whatsoever" and that she has to lie down for about two hours. The claimant indicated that she can no longer go to her children's ballgames or to Walmart. She avoids crowded places because she would likely have a panic attack. (R. 48-50).

Because of her anxiety, the claimant eats more food or less food depending on her mood and gained thirty pounds in the previous six months. She stated that much of her stress was because of her impaired memory. Her short-term and long-term memories, including memories of her children growing up, are impaired. The claimant testified that she managed her own money while she was working, but she did not feel capable of managing money anymore because of her poor memory. (R. 50, 67).

The claimant also testified that she began experiencing frequent migraines after her automobile accident, and that these headaches occur three or four days a week. She stated that, although Dr. Salisbury wrote a prescription to treat her migraines, she could not afford prescription medications and would only use over-the-counter medications. Her migraines would typically last three-to-five hours, and she could only relieve them by going into a dark room with no noise. (R. 48-49).

When asked whether she could follow the characters and plot of a two-hour movie, the claimant stated that she could not because she could not sit for two hours because of bulging discs in her back. She could sit back down after sitting thirty minutes if she took a few minutes to stand up and walk around. She stated that she could stand in one spot for only fifteen minutes and could not pick up a ten-pound sack of potatoes because of back strain. (R. 50-51, 69).

The ALJ asked the claimant why Dr. Salisbury discontinued her treatment and questioned the claimant about a drug screen from Dr. Salisbury, in which the claimant tested positive for Butalbital and Oxazepam. The claimant stated that she did not know anything about failing a drug screening and had never heard of those drugs, but indicated that the doctor told her she was short three Soma pills. The claimant denied taking anyone else's prescription medications. The claimant said she was not abusing any drugs or medications. When asked about narcotics, the

claimant stated that doctors gave her ten or so pills during her recent hospital visits.  (R. 51-52, 55).

The ALJ then questioned the claimant about her habit of going to various emergency rooms every couple of months and obtaining a prescription for narcotics. The claimant stated that her numerous problems—her back, legs, and teeth—would cause her so much pain that she would go to the emergency room when she could no longer endure the pain. The claimant testified further that she had not seen a regular medical doctor for reasons unrelated to mental health for a "long time." (R. 55-56).

When asked about her pain, the claimant stated that she could not see a pain doctor because of her lack of insurance. She stated that she had paid for her visits with Dr. Salisbury and her medications with the help of family, but that they stopped helping after Dr. Salisbury refused to treat her further. (R. 58-59).

The claimant testified that she never had surgeries on her back, as Dr. Salisbury had told her that her back was not ready for surgery. She also testified that she did file for Workers' Compensation while working as a CNA, and the nursing home put her on light duty several times and sent her to the company doctor.  The claimant affirmed that she had to take a test to become a CNA, and she studied for the test from a book. (R. 52, 61-62).

The claimant stated that at the time of the hearing she was living with her husband in her husband's car in her mother's parking lot, but had access to her mother's house.  The claimant's husband stacked heavy crates of chicken for a living. (R. 62-64).

The claimant testified that she could perform limited chores around her mother's house. She could do laundry if her mother brought it to her and fold and put up clothes. She stated that

she could help her mother feed her animals (about seven dogs and fifteen cats), but that she could do no sweeping, mopping, heavy lifting, or yard work. (R. 65-67).

The claimant testified that she received food stamps, but that she got most of her groceries through her mother and husband. She stated that her mother did the grocery shopping and most of the cooking, although the claimant tried to help prepare meals some. (R. 66-67).

The claimant stated that she could take a shower, dress, and take care of her personal needs without assistance, but could not take a bath in a tub or walk 100 meters because of pain in her right leg and hip. The claimant stated that her left leg did not hurt, but that her right leg pain affected her entire leg. She stated that the leg pain was not constant, but aggravated by walking, standing, or sitting for too long. (R. 67, 70-71).

*The Vocational Expert's Testimony*

A vocational expert, William Crunk, Ph.D., testified concerning the type and availability of jobs the claimant could perform. Dr. Crunk testified that the claimant's past relevant work was as a CNA, classified as medium, semi-skilled work; a cook, classified as light or medium work; and shift manager, light or medium semi-skilled work. (R. 74).

The ALJ asked Dr. Crunk to assume a hypothetical individual the same age, education, and experience as the claimant who can perform work at a medium level of exertion; can stand for a maximum of six hours, sit without limitation, and walk six hours in an eight-hour workday with normal breaks; can lift 50 pounds occasionally and 25 pounds frequently; has no limitation in reaching, handling, fingering, feeling, stooping, or kneeling; can occasionally climb steps, stairs, ramps, and ladders; can occasionally crouch or crawl; has no hearing or speech limitations; can understand and carry out simple instructions; can attend and concentrate on simple tasks for periods of up to two hours with customary breaks; may benefit from but would

not require a flexible schedule; may miss one or two days per month for psychiatric symptoms; should have limited contact with co-workers, supervisors, and the public; could accommodate changes to the workplace only if gradually implemented; and may require assistance to meet goals and make plans. Dr. Crunk responded that such an individual could not perform the claimant's past work, but could perform other full-time work in the economy, such as hand packer (medium level work with 100,000 jobs in the nation and 1,100 in Alabama); industrial cleaner or cleaner (medium level work with 120,000 jobs in the nation and 1,000 in Alabama); or laundry worker (medium level work with 182,000 jobs in the nation and 1,400 jobs in Alabama). (R. 73-78).

The ALJ then asked Dr. Crunk to hypothesize about an individual with the same exertional abilities as previously listed, except that this individual would be unable to adjust to routine and infrequent work changes; unable to respond appropriately to criticism from supervisors; unable to interact appropriately with co-workers; unable to maintain socially appropriate behavior and basic standards of neatness and cleanliness; and could not work twenty-five days per every thirty-day period because of psychological symptoms. Dr. Crunk stated that such an individual would not be capable of performing any full-time work. Dr. Crunk also testified that a person who, because of physical problems or side effects of medications, must lie down in excess of two hours per day, three or more days per week, would not be able to maintain employment of any kind. (R. 78-79).

*The ALJ's Decision*

On January 11, 2016, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured

status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since her alleged onset date of December 3, 2012. (R. 21).

Next, the ALJ found that the claimant had the severe impairments of osteoarthritis of the lumbar spine, asthma, affective disorder, and anxiety disorder. The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-22).

The ALJ considered whether the claimant met the criteria for Listings 12.04 and 12.06 involving mental disorders. He concurred with the opinion of the State agency psychiatrist Dr. Estock that the claimant only had mild restrictions in activities of daily living. The ALJ gave great weight to the opinion of consulting Licensed Professional Counselor Dr. Jack Bentley that the claimant could complete her activities of daily living without assistance. The ALJ acknowledged that Dr. Bentley was not an "acceptable medical source" according to 20 C.F.R. §§ 404.1513(a) and 416.913(a), but noted that he was an "other source" as defined by 20 C.F.R. §§ 404.1513(d) and 416.913(d). The ALJ determined that Dr. Bentley's opinion was consistent with the medical record as a whole. (R. 22).

The ALJ determined that the claimant had moderate difficulty with social functioning, concentration, and persistence or pace, relying on the opinions of Dr. Estock and Dr. Bentley, so that the claimant would be limited to simple work-related activities.  He also found that the claimant had no extended episodes of decompensation.  (R. 23-24).

The ALJ gave little weight to the opinion of psychologist Dr. Wilson that the claimant's IQ placed her in the intellectually disabled range. The ALJ found that Dr. Wilson's opinion was based on only one IQ test and, therefore, was insufficient to establish a diagnosis of intellectual

disability, especially considering the claimant's past work as a CNA, which is semiskilled work. (R. 22-23).

The ALJ also considered the opinions of the claimant's treating psychiatrist Dr. Richard Grant and the counselors at CED Mental Health Center that the claimant was not capable of gainful work because of her anxiety and depression, as well as her inability to maintain attention, be punctual, tolerate changes in routine, sustain an ordinary routine without special supervision, accept criticism appropriately, or work a full work month, having to miss ten to fourteen days per month. The ALJ gave little weight to the opinions of Dr. Grant and to the CED Mental Health therapists because he found nothing in the claimant's treatment records at CED Mental Health Center supported those opinions and because they were inconsistent with the record as a whole. (R. 23).

Next, the ALJ determined that the claimant has the residual functional capacity to perform medium work within the following limitations: can stand for a maximum of six hours per eight-hour workday with normal breaks; can lift and carry up to 50 pounds occasionally and 25 pounds frequently; has no limitation in reaching, handling, fingering, feeling, stooping, or kneeling; can occasionally climb stairs, ramps, and ladders; has no hearing or speaking limitations; cannot operate automotive equipment; should avoid unprotected heights; should avoid moving mechanical parts or large bodies of water; can understand, remember, and carry out simple instructions; can concentrate up to two hours on simple tasks with regular breaks; would benefit from a flexible schedule; may miss one or two work days per month; should be limited to occasional contact with the public, coworkers, and supervisors; must have gradual changes in the work environment; and would need assistance in setting realistic goals and making plans. (R. 24-25).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. The ALJ gave little weight to the claimant's own testimony about her limitations in her activities of daily living, because objective medical evidence did not verify either the limitations on the type of activities the claimant could perform or the degree of limitation. Specifically, the ALJ pointed out that the claimant's level of pain and frequency and severity of seizures was not consistent with the available medical evidence; that the record did not demonstrate that large crowds triggered the claimant's panic attacks; that she was frequently non-compliant with her medications; and that she sought treatment for her physical and mental impairments relatively infrequently. The ALJ found that the claimant's allegation that she could not afford her medications or doctor visits was inconsistent with her husband's income. (R. 26-27).

Next, relying on the vocational expert's testimony, the ALJ found that the claimant could not perform any of her past relevant work. The ALJ determined that based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, jobs existed in significant number in the national economy that the claimant could perform. The ALJ found that the claimant had the residual functional capacity to perform the requirements of unskilled occupations at the medium level of exertion, such as hand packer, industrial cleaner, and laundry worker. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 28).

# VI. DISCUSSION

*The Weight the ALJ Gave to the Treating Psychiatrist Dr. Grant*

The claimant argues that the ALJ erred when he gave little weight to the opinion of the Dr. Grant, the claimant's treating psychiatrist. The court agrees. The ALJ failed to articulate specific reasons supported by substantial evidence to discount Dr. Grant's opinion regarding the claimant's mental limitations.

The ALJ must give the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004). The ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). However, the ALJ commits reversible error when he fails to articulate specific reasons for failing to give a treating physician substantial weight or if his articulated reasons lack substantial evidence. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

In the present case, the ALJ wrote one sentence when he explained why he gave little weight to Dr. Grant's opinion regarding the claimant's mental limitations: "Little weight is given to . . . [Dr. Grant's] medical source statement . . ., as there is nothing in the claimant's treatment records at CED Mental Health Center consistent with them or to support them." (R. 23). The ALJ fails to explain specifics about how those treatment records do not support Dr. Grant's opinion. In fact, the treatment records and the claimant's testimony do support Dr. Grant's opinion, and the ALJ was wrong to summarily discount Dr. Grant's medical opinion.

Between December 2012 and June 2015, the claimant received therapy at the CED Mental Health Center on at least ten occasions, under the care of Dr. Grant, her treating psychiatrist who oversaw her medications and overall progress. Dr. Grant personally examined

the claimant on at least three occasions during that time and continuously reviewed the treatment records of her therapists. Dr. Grant diagnosed the claimant with major depression, severe without psychosis; PTSD; and seizure disorder, and treated her for depression and anxiety for two-and-a-half years.

By January 2015, the claimant's anxiety and seizures increased, and she reported to her therapist and Dr. Grant that she was having audio hallucinations, including hearing voices calling her name. In discounting Dr. Grant's December 2015 opinion, the ALJ did mention that, by June 2015, the claimant's depression had improved; however, the ALJ failed to mention that her anxiety had increased from February through June 2015, and that she was demonstrating signs of paranoia and believed that people were plotting against her. Moreover, the ALJ seemed to ignore the facts that in October and November 2015, just about a month before Dr. Grant rendered his medical source opinion, the claimant's anxiety had continued to worsen.

Instead of giving great weight to her treating psychiatrist Dr. Grant, who had followed the claimant's progress for over two years and was in a better position to assess how her anxiety would affect her ability to work, the ALJ gave great weight to the opinion of state consultant Dr. Bentley, who saw the claimant only one time and was not even an acceptable medical source because he was only a licensed professional counselor. The ALJ also gave great weight to Dr. Estock, a consulting state psychiatrist who merely reviewed the claimant's records and had never personally evaluated the claimant's mental condition. The ALJ erred in discounting Dr. Grant's opinion without giving specific reasons for doing so supported by substantial evidence, and in giving Dr. Bentley and Dr. Estock more weight than Dr. Grant, her treating psychiatrist.

The court notes that Dr. Wilson's opinion supports that of Dr. Grant, yet the ALJ only focused on discounting Dr. Wilson's assessment of the claimant's low IQ score. Given the

claimant's head injury in 2012, many years after she worked as a CNA, and her continued

seizures, Dr. Wilson's assessment regarding the claimant's intellectual functioning makes sense.

Moreover, substantial evidence in the record, including Dr. Grant's opinion, supports Dr.

Wilson's opinion regarding the claimant's mental limitations because of her anxiety.

Her treating psychiatrist Dr. Grant and Dr. Wilson, a licensed psychologist who

examined the claimant and reviewed her records, agree that the claimant's limitations are more

severe than the ALJ concluded. Yet the ALJ gave more weight to the opinion of Dr. Bentley, a

non-medical source, and Dr. Estock, who merely reviewed the claimant's records and never laid

eyes on the claimant. The ALJ failed to articulate reasons supported by substantial evidence for

giving Dr. Grant and Dr. Wilson's opinions considerably less weight than those of Dr. Bentley

and Dr. Estock, and his failure to do so is reversible error.

## VII. CONCLUSION

For the above reasons, this court concludes that the ALJ erred in giving the claimant's

treating psychiatrist Dr. Grant little weight. Therefore, this court will REVERSE and REMAND

the Commissioner's decision for the ALJ to determine whether the claimant is entitled to

disability benefits consistent with this opinion.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 19th day of September, 2017.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE